CENTRAL RAILWAY COMPANY v. H. R. HEARNE.

1—The best evidence of the terms of an act of the Legislature, is a copy of the enrolled bill, duly certified, and it was error to exclude such evidence when offered to show a variance between the statute as passed by the Legislature and as printed among the published acts.

2—In a suit against a railway company for overcharging on certain freight, by rating cotton as "measurement freight" instead of "weight freight," (the company's charges being limited per foot as well as per hundred pounds,) it was error to admit the evidence of merchants and shippers to

prove that, by custom, cotton was "weight freight" and not "measurement freight." The company might lawfully rate cotton either by measurement or weight, but could not charge according to both standards on the same lot of freight.

ERROR from Harris. Tried below before the Hon. George R. Scott.

This suit was brought to the Fall term (1867) of the District Court of Harris county. Its character and purpose is clearly stated in the opinion of the court. Hearne, plaintiff below, obtained verdict and had judgment for $208 56, at the Spring term, 1869.

In his original and amended petitions the plaintiff alleged that by the custom of the country and commercial custom, cotton in bales was universally deemed and known to be "weight freight," and was so known and deemed at the time the railway company was incorporated and accepted its charter; and it was alleged, in effect, that under its charter, the company had no option to charge on cotton in bales otherwise than as weight freight. This was the feature in the plaintiff's petitions which subjected them to the demurrer of the defendant.

The other questions decided in the opinion arose upon rulings of the court below in excluding and admitting evidence, the nature of which is clearly indicated in the opinion.

The only difference between the act as printed and as enrolled occurs in the clause prescribing the maximum charge allowed on freight; the printed act having it "fifty cents per hundred *and* twenty-five cents per foot," per hundred miles, while the law as enrolled had it "fifty cents per hundred *or* twenty-five cents per foot."

*Gray & Botts*, for plaintiff in error.—In our State, and all States governed by written constitutions and enacting laws by representatives, the laws enacted are enrolled by the legislative body, transmitted to the executive department, and deposited as enrolled records in the state department, there to be kept for safety, and as evidence of what the legislative declar-

ation of its will really was, to be referred to for all time, as proof of it, according to constitutional provisions. These records constitute the muniments of title and protection to the people acquiring rights under them, or whose rights are in any way affected by them. They take effect and are acted on as the law from the date of their enactment, or other time specified by law, whether they be promulgated by printing or not. The enrolled acts, or certified copies of them from the state department, is the evidence on which the governor, and every department, are authorized to act and do act instantly. Hence the laws are put in operation and held binding without printing. That such has been the practice in Texas, and that parties have been held bound by laws not printed and circulated, is well known to this court. In years past it has frequently happened that the publication of the statutes has been delayed a long time, yet rights have been adjudicated under them and parties held bound, though in actual ignorance of them. It is well remembered that in the days of the Republic this often occurred. In 1840 the common law was introduced, and most important laws enacted, yet they were not printed for many months after they took effect, even in the newspapers. Vast interests were affected by unprinted laws, yet no one questioned that they were in force, because they had been enacted and were enrolled in the proper department. I well remember a case where property had been sold under execution, and supposed right to it acquired and claimed for years, until on a trial most unexpectedly arising where the validity of the title came in question, that link was found defective, because the law under which the sale was made had been repealed at Austin about eight days previously, though it was not published in the county for months afterwards. What, then, was the highest evidence of the law? Clearly the record of it, or an exemplified copy, for none other existed, and none other in the nature of things could exist of primary character. On this subject we refer to the Elementary Works on Evidence, and to the following cases: Mathews v. Zane, 7 Wheat, 164;

The Anne 1, Gallison, 62 ; Warren Manufacturing Company
v. Etna Insurance Company, Pa., 502 ; Richardson's case, 2
Story, 571 ; Ankrim's case, 3 McLean, 285.

In absence of the record, or an exemplification of it, printed
statutes published by authority, are admissible in evidence by
statute (Pas. Dig., Art. 3712). This, however, does not declare
the degree or grade of it, and it is secondary evidence. It is
at best only a copy of a copy—a copy from the record by a
clerk furnished the printer and manipulated into print by him.
(Paschal, Art. 5091.) In short, a second-hand copy of the
record, liable to such mistakes as printers so frequently make,
that " a mistake in print" has become a household phrase.
Mr. Disraeli, Sr., in his remarkable work on " The Curiosities
of Literature," has stated that the miraculous event had never
yet occurred of a book printed, in which many errors had not
been found, spite of the most careful revision and repeated
proof reading. Knowing as we do how careful some publish-
ers have been, and with what pride they contend for accuracy
in the print of a highly prized book, how far less reliance
should be placed on copies of laws printed in haste, and
hurried through the press by contract for pay at the lowest
compensation. It may be wise to allow such books to be relied
on as evidence of the law, when undoubted and uncontradicted,
but surely not when denied, and shown to be falsely printed by
examination of the record. By such reliance the Legislature
is held to command that which it did not command, and a rule
is enforced which was not the rule prescribed by their will,
and that of the people through them. The printer thus makes
the law, or the judge, whose duty it is to expound the law as
declared by the Legislature, usurps their functions and becomes
a lawgiver. This result follows whenever he follows the
printer in preference to the enrolled law, or takes usage, or
any other extrinsic circumstance, as evidence of the law.
(Sedgwick Stat. Law, pp. 22 to 25, 295, 378 to 381.)

The statutes of the United States declare : " The acts of the
Legislatures of the several States shall be authenticated by

having the seal of their respective States affixed thereto," etc. (1 U. S. Stat. at Large, p. 122 ; Pas. Dig., Art. 3709 and note 835, with authorities cited.) "Copies of private bills, certified to by the secretary of state and attested by his seal of office, which is deposited in the office of the secretary of this State, shall be evidence in like manner." (Pas. Dig., 3712, in last clause.) Also, "copies of the records of all public officers and courts, etc., in all cases where the records themselves would be admissible." (Art. 3715.)

Elementary writers on evidence and decisions of courts are full of the doctrine that an exemplified copy of the enrolled act, or any public record, is next to the record, the highest and best evidence of its contents; and upon an issue of *nul tiel* record, as in this case, the only perfect evidence. The rule is that "the best evidence of which the case is susceptible in its nature must always be produced." (1 Greenlf. Ev., §§ 52 and 32.)

"It is essential to the pure administration of justice." It means "that no evidence shall be received which is merely substitutionary in its nature, so long as the original evidence can be had; and that which indicates the existence of more orignal sources of information, is excluded." The exceptions to this rule include the case of public records, which can not ordinarily be removed from the place of safe-keeping, for inspection, and therefore sworn examined copies, or those certified by a sworn officer and keeper of them, stand, and are received as the originals. (1 Greenleaf's Evi., 591 ; 1 Gilbert's Evi., 19 ; 3 Coke's Inst., 173 ; 1 Starkie's Evi., 195, 197 ; 1 Phillips' Evi,, ch. v, pp. 383–4, and note.

There is no question that by statute, in Texas printed copies of public and private acts, published by authority, are admissible in evidence ; and so also in some exceptional cases in England. But the question is, which is the best evidence, the print or the exemplification of the enrolled act? Both may be competent, but which is the most reliable and conclusive? We submit that in the nature of the case the exemplification is best, for the reasons already given.

Lord Chief Justice Holt held that though "an act, printed by the King's printers, was admissible in evidence, it was not sufficient on an issue of *nul tiel record.*" (Anon. 2 Salkeld, 566.)

So, also, Lord Ellenborough, when Ruffhead's old printed edition of the statutes differed from a later one, printed by the King's printer, required proof to be made of the statute by an examination of the Parliament roll. (Rex v. Barnitt, 3 Camp., 344.)

In America it was ·held by Judge McLean that a printed statute may be corrected by the enrolled bill filed in the department of state. To this case we invite the special attention of the court. (Reed v. Clark, 3 McLean, 480.)

A very interesting case, involving the question, what is the highest and conclusive evidence of the enactment and contents of a statute, passed in New Jersey, " to establish a police district in the county of Hudson," etc., was decided by the Supreme Court. It was objected that it had not really been passed by the Legislature, in the form in which it had been enrolled, and was certified by the state department; and that certain amendments had been adopted which were not enrolled as a part of it. It was attempted to show this by the journals and other extrinsic testimony. A thorough discussion of the entire subject of the enactment of laws and the evidence of them, was had, and an exhaustive opinion delivered by Chief Justice Beasley. It shows that the mode of enacting and enrolling acts there are substantially the same as is required by our constitution; that journals of the proceedings are to be kept in the same way, and that the enrolled acts are deposited as records to be kept and certified by the secretary of state. It also reviews the English mode, and states its analogy. Upon the question whether the court can resort to the journals, or other evidence, for information as to the fact that the law was such as appeared by the roll? the authorities, English and American, were reviewed, and the result is announced: "That both upon the grounds of public policy and upon the ancient

and well settled rules of law, the copy of a bill, attested and filed in the office of the secretary of state, is the conclusive proof of the enactment and contents of a statute of this State; and that such attested copy can not be contradicted by the legislative journal, or in any other mode." (The State v. Young, decided in 1866, and reported in Am. Law Register, vol. 5, new series, p. 679.)

If the journals, then, cannot be evidence to contradict or vary the enrolled act, much less can a printed copy, subsequently made, do so.

To the same effect in principle, either recognized or directly decided, are the Pacific R. R. Co. v. The Governor, 23 Miss., 353; Fouke v. Flenning, 13 Maryland, 412; Duncombe v. Prindle, 12 Iowa, 1; Peo v. Purdy, 2 Hill, 31; 4 Id., 384; Eld v. Gorham, 20 Conn.; Pease v. Peck, 18 Howard, 595.

In United States v. Amidy, 11 Wheat., 392, "The State seal, and no other formality, was required to authenticate, and is supposed to import perfect verity," and it held that such exemplification of a statute is conclusive evidence of it. (United States v. Johns, 4 Dallas, 412; Hauthorn v. Doe, 1 Blackford, 157; State v. Carr, 5 New Hamp., 367.)

That such is the law there can be no doubt. Yet the court below refused to consider the exemplified act, having all the requisites to authenticate it on its face. True, it was objected that it did not appear to have been approved by the governor, but the court rightly overruled that objection, because it appeared to have been duly passed and certified by the clerks of each house, and was delivered to the governor too late in the session to require his approval. It was passed on the 30th of August, and presented to him on the 31st—one day before adjournment—and in such case became a law, unless vetoed by him, without his approval, and was accordingly deposited as a law duly enacted, according to the constitution. (See Art. 5, § 17, last clause.) The only ground on which it was excluded was, that the defendant had published a pamphlet containing a copy of the act as printed in the statute book; and had not

changed their rate of charging by weight until 1865. This was the only acquiescence in the matter, and was really none at all, for it was by the act optional with them by which standard to charge. They were not required to exercise that option, or to change their rate of charges, unless they saw proper, and found it advisable, by the necessity or convenience of trade; and to hold that their publication of an incorrect copy of an act, under such circumstances, was binding as law, would be, in fact, making a new law, which had never been enacted, by means far more objectionable than the printing by the public printer in the authorized book. No one had been induced to act, on the faith of their printed copy, to their injury. No rights had grown up under it. No one had been deceived as to the law, for no question had been made, in regard to its terms or meaning, until the change of rate had been made and announced in 1865. Upon what mode of right reasoning, then, the court came to its conclusion, we can not perceive or appreciate. We think it clear, therefore, that the court erred in not considering the real and true act, if indeed its terms, in the use of the word " or " instead of " and," as printed, makes any substantial difference in its construction.

The true rule for construction of charters to private companies has been often declared in the Supreme Court of the United States, and is well stated by Judge Wayne in the opinion of the court in the case of Moran v. Commissioners of Miami county, 2 Black R., 723. He said: "In our construction of the act of Pennsylvania to incorporate the Northwestern Railroad Company, the court said, that neither privileges, powers, nor authorities, can pass, unless they are given in unambiguous words, and that an act giving special privileges must be construed strictly. That in case a sentence is capable of having two meanings, a construction must be given favorable to the public. *However, that in applying those principles of construction, it must be done* with reference to the subject matter contemplated by the Legislature, as a whole, *so as not to allow its manifest* purpose and design *to be defeated,* by

denying the use of the means by which the main object could only be accomplished."

(See, also, Binney v. Chesapeake and Ohio Canal Company, 8 Peters, 212.)

The doctrine is, that a corporation is limited to the exercise of those powers which are specially conferred. It takes nothing but what is plainly expressed and unequivocally granted. Implied immunities, such as exemption from taxation, can not be claimed. "Such immunities must be granted by express words." "Private statutes," said Chief Justice Parsons, "ought not to be construed to affect rights or privileges of others, unless such construction results from express words or necessary implication." (Coolidge v. Williams, 4 Mass. R., 140.)

"A charter must be construed according to the intent of the Legislature, if such intent can be ascertained by the language used." (Coe v. Pennock, 6 Am. Law Reg., N. S., 27, and same case on appeal in 23 How. U. S. Sup. Ct., 117.)

"In all cases the construction should be such as carries into effect the true intent and meaning of the Legislature." (Chesapeake and Ohio Canal Company v. Key, 3 Cranch, C. C., 599.)

All the authorities are to the same purport. None deny that the act must be construed from the express words and their necessary implication. No where is it held that the ambiguity is to be raised by aid of facts outside the language, as by usage.

No where is it held that the object and design of the act is to be gathered from anything but the plain words of it, or by reference to acts in *pari materia*. No where is it held that a private statute, amendatory of a former defective act, and intended to remedy that defect, shall be defeated in its effect, or limited in the meaning of its language, by extrinsic evidence.

Viewed in the light of the strict rule admitted, still what we have said already, as to the construction of this law, is not impaired. Its express words are plain—too plain to be defeated even by strict construction.

Can usage be given in evidence to construe a law so expressed? We submit that it can not. The primary and controlling consideration is the express words of the law. Usage can not vary or affect a power or right conferred in express terms. It is the duty of the Legislature to make the law; that of the judges to declare and apply it as expressed. (Sedgwick on Statutes, ch. 6 ; Thompson v. Buckley, 1 Tex.; 35.)

It will be observed that usage of custom arising under a law, as a practical construction of it after its enactment, and before decisions on its effect, is a very different thing from a usage existing at the time, being evidence to control or affect the meaning of a law. The intention of the Legislature may have been to abrogate the usage then existing. Can the judge say that it did not, but that it was really intended to conform to the usage? This would be judicial legislation, not declaring the law, but making it. Usage *under an act* doubtful in its language may, as an extreme resort, be applied to construe it, but not to vary or defeat it. In Floyer v. Edwards, Cowper R., 112, Lord Mansfield said: "The use of this practice will avail nothing if meant as an evasion of the statute, for usage certainly can not protect usury." So in King v. John Hogg, 1 D. & E. R. 721, it was held that a particular usage can not be admitted to interpret a general act relating to the English poor rates. Also in Noble v. Durell, 3 D. & E. R., 271, and Master of St. Cross v. Lord De Walden, 6 D. & E., 338, held that the acts of Parliament fixing one standard of weights and measures, could not be varied by local customs and usages.

Cases more to the point before us are found in this country. In Paull v. Lewis, 4 Watts Pa. 402, it was held that a contract for the sale of lands by the acre, means a statute acre; and parol evidence of a general understanding to the contrary is inadmissible. In Evans v. Myers, 25 Penn., 114–116, where the statute directs that twenty hundred pounds shall make one ton, and a contract was made for forty tons of pig metal, it was attempted to show the usual custom of dealers in pig metal was to buy and sell by a gross ton of 2268 pounds; but the

court held that the statute entered into the contract, and could not be so construed by usage.

In the present case the statute makes the rate of charge for railroad freights on cotton that which the company may see proper to establish, by weight or by measure; but the parties attempt to make usage of freight by weight, as then existing, the only standard, and so to vary the act and intention of the Legislature. We submit that it cannot be thus abrogated or varied, without violating the legitimate rules of construction. This will be more clearly seen when we consider the rules as laid down by all writers on interpretation of statutes. (See Sedgwick's entire chap. 6, p. 225; 1 Black. Com., 60, and 1 Kent Com., 459–468.)

That usage existing " before, at the time, and after " the enactment (of which, in the language of the bill of exceptions, evidence was admitted in this case,) is not admissible upon any correct principle of construction, is well settled by the highest and ablest authorities.

" Nothing," said Chief Justice Gibson, in Bolton v. Calder & Wilson, " should be more pertinaciously resisted than these attempts to transfer the functions of the judge to the witness' stand, by evidence of customs in derogation of the general law; that would involve the responsibilities of the parties in rules, whose existence, perhaps, they had no reason to suspect before they came to be applied to their rights. If the existence of a law be so obscure as to be known to the constitutional expounders of it only through the evidence of witnesses, it is no extravagant assumption to take for granted that the party to be affected was ignorant at the time when the knowledge of it would have been most material to him, and to try a man's actions by a rule with which he had not an opportunity to become acquainted beforehand, is the worst species of tyranny."

The latter cases show that the dislike to the admissibility of usages in general, which seems always to have characterized the ablest judges in this country, is now becoming general. " I am among those judges," says Judge Story, in Donnell *et al.*

v. Columbia Insurance Company, 2 Sumner, 367, " who think usages among merchants should be very sparingly adopted, as rules of court, by courts of justice, as they are often founded in mere mistake, and still more often in the want of enlarged and comprehensive views of the full bearing of principles."

" No usage or custom," says Judge Bronson, in Hinton v. Locke, 5 Hill, 437, " can be set up for the purpose of controlling the rules of law."

" Custom can not modify a statute." (The Forrester, Newbury's R., 81.)

" Usage of merchants is a law of their own making, and binds only where no other law is applicable." (Willcocks v. Phillips, 1 Wall, Jr., C. C. R., 63.)

" A local custom, opposed to the provisions of a statute, is not binding." (Walker v. Transportation Company, 3 Wallace, 150.)

The same objection applies to a written statute as to a written contract, that usage can not control or vary it. " Usage," said Lord Lyndhurst, in Blockett v. R. E. Insurance Company, 2 Tyrwhitt R., 266, " may be admissible to explain what is doubtful, but is never admissible to contradict what is plain."

" Usage is never allowed to oppose or alter a general principle or rule of law, or to make the legal rights of parties other than they are by the law." (Eagar v. Atlas Insurance Co., 14 Pick, 141.) Or to change the liability on agreements. (Stillman v. Hurd, 10 Texas, 109 ; Schooner Reeside, 2 Sumner, 568 ; Stoever v. Whitman, 6 Binney, 416.) The authorities on this subject are too abundant to need further citation.

*Davis & Beall* and *Stewart & Barziza*, for the defendant in error.—It is quite enough for the purposes of the issues raised here to refer the court to the manner in which the laws are made evidence in courts of justice, whether *public* or *private acts*, in the State of Texas. And we need only refer the court to Art. 4579, Paschal's Digest, which makes it the duty of the secretary of state to attend at every session of the Leg-

islature for the purpose of receiving bills, which have become laws, and immediately after the close thereof, causing said laws to be bound in a volume and to be delivered ( a copy thereof) to the public printer, and afterwards carefully to examine and compare the printed copy, and correct all errors.

Arts. 4581 to 4586 show how said laws are distributed for the information of the people. We now reach the most material and important point of inquiry, and upon which there arises a wide difference between ourselves and counsel for plaintiffs in error. It is how shall said laws, when printed and distributed, be given in evidence in the courts of Texas? The plaintiffs insist that the best evidence is the enrolled bill in the department of state, and the next best evidence is a certified copy under the secretary's seal. We reply that the enrolled bill is no evidence at all, but is an archive which the policy of the law forbids being removed from the department rolls; and that "the best evidence of which the case in its nature is susceptible (which is all the law requires) is either the printed statutes or a certified copy. The original enrolled bill is not evidence, though it may import absolute verity, which can be used in the courts, and in view of this fact, the Legislature has exalted the printed laws to the grade of primary evidence. It is evident that if the original bill, as enrolled in the department, was the *best evidence*, the rights of parties litigant would necessarily suffer very frequently in one part of the State, while the original would be used in another part; and hence, as the original could not be used at the same time in any two courts, great inconvenience and injury would necessarily result. The Legislature, to obviate this, have enacted a law expressly making "the printed statutes evidence in this State of the private acts therein contained." (See O. & W. Dig., Art. 471; Greenleaf Ev., vol. 1, § 480, and notes 2 and 3.) If, however, we should admit that the enrolled bill was the best evidence, and that the statutes and certified copies were but secondary, it would not militate in the least against our position, as there is no principle of law better settled upon principle

and authority than that in secondary evidence there are no degrees: "That to extend the principle this far would be to confound all distinctions between the weight of evidence and its legal admissibility; that the rule is founded upon the weight of evidence, considered in regard to its nature, and to extend it to secondary evidence would often tend to the subversion of justice, and always be productive of great inconvenience." (Greenleaf Ev., vol. 1, § 84, and note 2; Pease v. Peck, 18 Howard U. S., 595; Root v. King, 7 Cowen, 613, 636; Watkins v. Hohnan, 16 Peters, 25; Greenleaf Ev., vol. 1, § 482; Lord Melville's case, 29 Howell, St. Tr., 683, 685; 7 Tex. R., 311, 316.

This doctrine is so consonant to reason that we will not cite other authorities, but leave it to the sound judgment of the court. The authorities quoted and relied on by the counsel for plaintiffs in error, and mainly applicable under a plea of "*nul tiel* record," are almost entirely drawn from the English law, and date back anterior to the passage of the Statute 41, George III; which has engrafted a new rule upon the body of English jurisprudence, and made the printed statutes evidence in all the courts, both of England and Ireland. (See Sedgwick on Com. and Stat. Law, p. 120.)

Art. 3712, Paschal's Digest, makes this the settled law of Texas, as decided in the case of Martin v. Paige, 11 Tex., 292. But we can not refrain, before leaving this point, in calling the attention of the court to the law as adjudged by the Supreme Court of the United States, in the case of Pease v. Peck, above referred to, in which it was held "that the printed book containing the statute under consideration, is the best evidence of what the statute was, and that the original record is not to be received to show that the printed book is incorrect, or as evidence of the statute as adopted at that time." In view of the reasons assigned, and the authorities above cited, we submit that the court below did not err in receiving and considering the printed statutes as evidence of what the defendant's charter really was.

Among other means outside of the statute of arriving at legislative intent, Mr. Sedgwick lays down usage and custom as of great aid in the construction of statutes, and furnishes many illustrations. Indeed, to this method of interpretation all the text writers have given their sanction, and it has grown into a maxim in law, that *"optimus legum interpres consuetudo,"* and the experience of all must confirm the wisdom of the rule. In a case in the House of Lords on the statute 27, Henry VIII, Lord Hardwicke said: "Consider, also, the usages and transactions of mankind upon the statute." (See 2 Eden C. R., 61, 64, 65.)

In the case of The Bank of Utica v. Mersereau, 3 Barb. C., 530, 577, it was held in New York, when at tax sales the comptroller was directed to execute conveyances in the name of the people, and disregarding the statutes, deeds were given in the name of his office, that these deeds were sufficient to pass a legal title, on the ground of " a uniform custom to give deeds of this kind in this way."

It will be perceived that we have not in argument or citation of authority pushed the doctrine of resorting to usage and custom to the extravagant length which would make us obnoxious to the authorities cited by the plaintiff in error upon this subject. On the contrary, we freely admit that no usage nor custom can be admitted to contradict an express statute, where it is free from doubt and ambiguity. But we do insist that usage and custom may always be received to aid in construing doubtful statutes. And the authorities cited by the plaintiff in error, in their utmost sweep, do not extend beyond the rule as stated; and in support of which we refer the court to all the authorities collated by Mr. Sedgwick, in his work on Stat. and Com. Law, pp. 255 to 260 inclusive.

WALKER, J.—Hearne, the plaintiff below, brought suit against the plaintiff in error, to reclaim certain sums of money which he alleges were extorted from him through his agents, Austin, Lewis & Co. and J. S. Sellers & Co., by said railroad

company, by an overcharge of freight on certain lots of cotton, in bales, shipped by him over the company's road, from Millican to Houston, a distance of eighty miles.

The petition alleges that the railroad company was limited to certain rates of charge on freights at given distances, by the terms of its charter, and that it exceeded its franchise, and unjustly charged him more than by law it was entitled to charge and receive. This is the gravamen of the action; and to determine this question by law was the sole duty of the court below, and we can not see how any very grave difficulty could have arisen in pursuance of this single purpose.

The railroad company answered by a general demurrer, and also by a general denial, except as to its corporate character, and the distance from Millican to Houston; and especially averred that the act of September 1st, 1856, as claimed by the plaintiff, was passed on the 30th of August, 1856, and read (so much of it as applied to the case) as follows: "Said company shall have the right to demand and receive such rates and prices for the transportation of passengers and freight as they think proper to establish—not to exceed five cents per mile for passengers, or fifty cents per hundred, *or* twenty-five cents per foot for freight, per every hundred miles the same may be carried." It appears that there was a verbal variance in the act between the printed copies of the private statutes and the enrolled bill. On the argument of the demurrer, the defendant produced a certified copy of the enrolled bill to prove the variance, claiming that this copy was the best evidence of what the law really was.

The court refused to receive the copy so certified, and overruled the demurrer. And it appears from the record that upon the trial it admitted the evidence of merchants and shippers to prove that by custom cotton was shipped by weight and not by measurement. We think the court erred in overruling the demurrer, in refusing to receive the certified copy of the enrolled bill as the best evidence of the terms and meaning of the law as it passed the Legislature, and in receiving evidence

XXXII—35.

of the custom of merchants and shippers to contravene the positive terms of a statute. The authorities cited by the plaintiff in error are so apt and so numerous, that it is difficult to find any additional ones, and we refer to one only outside the brief—the case of " The State v. Marshall, 14 Ala., 411. There the court say : " Notwithstanding the statute in which the offense is described is printed " *attempt*," instead of " *intent*," yet as the true language of the act, as shown by the original enrolled bill, is an assault with *intent* to murder, that must be considered as the true meaning of the printed statute." This was a criminal case of great importance, was ably argued by prisoner's counsel and by the attorney general, and considered and decided by an able court.

We think the District Court, in this case, should have taken the reading of the certified copy of the enrolled bill for the true meaning of the printed law. But the materiality of this reading of the company's franchise, to us is not very apparent.

Let us see what the rights of the company are under the law as received by the District Court: " The company may charge fifty cents per hundred pounds, *and* it may charge twenty-five cents per foot," but certainly not both, upon the same article. Or let us read it as the plaintiff in error claims it should be read : " The company may charge fifty cents per hundred, or twenty-five cents per foot." The latter reading renders it a little more apparent that the company are not to charge according to both standards upon the same article.

It is not insisted that the company has violated its franchise by charging both by weight and measurement, but that this particular kind of freight, *by custom*, could only be charged as weight freight ; and the court admitted evidence of the custom of shippers to govern an express grant of the Legislature to this incorporation. And certainly a very learned and able argument was submitted to us in defense of this action of the court below. But we can not give way to any argument, however able, logical and cogent, which merely points out to us

what the law *ought to be*, when it is met by one equally able, showing us what the law *is*. Nor have we any right, even in the strongest case, as a court, the mere interpreters and administrators of the law, to quarrel with the Legislature because we may believe their acts are against public policy.

It is sometimes said that the Camden and Amboy Railroad Company owns the State of New Jersey, and that the Pennsylvania Central and the Erie alike control the great States of New York and Pennsylvania; and this is by no means the first time that a court of justice has been compelled to acknowledge its inability to correct what have been deemed public abuses.

Notwithstanding the great and growing necessity in our State for railroads, it may be well that our young giant should take warning of the abuses of incorporated monopolies. Yet, it must be said that this was the pioneer road in the State—built when capital was scarce, running through a country but thinly inhabited, where but little trade could be expected, and that, from these and other causes, necessity required that it should have extraordinary franchises. This is, no doubt, all true, and should be considered before the hue and cry be raised against the company. The public should consider the great advantages derived by the State from the construction of such a road, and the immense sums of money expended in building and operating it, and such indulgence be awarded as fairness requires. These are all matters which really do not concern nor make up any part of our opinion in the case at bar. But so much has been said in argument of the latitudinous powers of this company, and its abuses of legitimate power, that we feel it due to the Legislature that something should be said in vindication of their acts; besides, the Legislature has still reserved the power to take up and control this franchise, should public necessity require it.

We do not think the plaintiff in error has exceeded the expressed grants of power given to it by the Legislature, and we are, therefore, of opinion that the court below should have

sustained the demurrer to the petition, as amended, and have dismissed the suit. We, therefore, overrule the judgment of that court, and order the case dismissed, with costs to the plaintiff in error.

Reversed and dismissed.